## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY FRINTNER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TRUEPOSITION,** | : | |
| **Defendant.** | : | **No. 11-3454** |

### MEMORANDUM

PRATTER, J.                                                                AUGUST 27, 2012

Plaintiff Mary Frintner raises a host of gender discrimination claims against her former employer, TruePosition.  TruePosition moves for summary judgment on all claims.  In addition, TruePosition has filed three motions *in limine*.  The Court will address each of these motions in turn.

## I.      BACKGROUND[1]

TruePosition hired Mary Frintner in January 2005, to work as a contractor in TruePosition's documentation department.[2]  At some point in the spring of 2005, Ms. Frintner and other female members of the department complained to the company's Human Resources authorities about alleged gender-based discriminatory treatment by the department manager, Ron Enfield.  After six months as a contractor, Ms. Frintner was laid off for a period of five months,

---

[1]      The following factual background is undisputed, unless specifically noted.  Many of the "facts" set forth by Defendant TruePosition either did not include specific citations to the record or included citations to the record that did not actually support the proffered "fact."  Thus, such "facts" were not included here.

[2]      Over time, the name of the documentation department changed.  For ease of reference, the Court will refer to the department in which Ms. Frintner worked as the documentation department.

after which time TruePosition interviewed and hired her as a full-time Technical Writer in the documentation department.  Upon being re-hired, Ms. Frintner again reported to Mr. Enfield.

In 2007, Steve Maiorano was hired as the Senior Manager of Training and Documentation, and Mr. Enfield was demoted to Senior Technical Writer.  Accordingly, Ms. Frintner began reporting directly to Mr. Maiorano.  Mr. Maiorano, whose background was primarily in training rather than in technical writing, assigned numerous managerial and leadership duties to Technical Writers on the staff, particularly to Ms. Frintner.  Ms. Frintner successfully performed all of the extra "lead-like" duties, some of which had been assigned to her even before Mr. Maiorano took over the department.  Although Ms. Frintner reportedly enjoyed the additional work and responsibility assigned to her and characterized her relationship with Mr. Maiorano as "excellent," she also felt that she should receive additional compensation for the work that she performed above and beyond her job description.

Based on the extra duties Ms. Frintner was performing, Mr. Maiorano recommended her for a 14% pay increase, as well as a promotion to Senior Documentation Lead, a title which did not exist at the time in the documentation department.  Despite Mr. Maiorano's statements and the approval of Dr. Homaira Akbari, Executive Vice President for Operations at TruePosition, the promotion and raise never quite materialized.[3]  Instead, Ms. Frintner was promoted to Senior Technical Writer, received only a 5% pay raise, and was, at least temporarily, relieved of some, but not all, of the extra management duties.

---

[3]     Steve Picciocchi, Director of Human Resources, testified that Paul Meredith, Vice President of Operations, concluded that the position of "Senior Documentation Lead" was not necessary.  An email from Mr. Maiorano to a Human Resources employee, copying Mr. Meredith, however, states that Mr. Meredith signed off on Ms. Frintner's promotion.

In January 2008, Alan Larrabee, formerly of OpenWave, was hired by TruePosition as the Vice President of Research and Development and assumed oversight responsibilities for the documentation department.  Shortly after he joined the company, Mr. Larrabee began recruiting new employees.  In so doing, he decided to replace was Mr. Maiorano, who Mr. Larrabee believed was not an effective leader of the Documentation and Training Department.  The official reason for Mr. Maiorano's separation was a "reduction in force," rather than termination because of performance issues.

Around this time, Pat Leihy, Senior Director for New Products and Releases, recommended to Mr. Larrabee that Ms. Frintner be promoted to manager of the department. Rather than replacing Mr. Maiorano with another manager, however, Mr. Larrabee recruited Steve Straight, a colleague from OpenWave, to be Director of Technical Publications and Training in May 2008.  Mr. Larrabee did not post the position internally and did not consider any other candidates for the job.

There is some dispute over whether or not Ms. Frintner was qualified for the director position.  At her deposition, she testified that she did not think she would have been "a likely candidate" for the director position because she did not have experience relevant to the typical director position at TruePosition.  However, she contends that because she had already performed extensive managerial duties and was seen as the *de facto* head of the department, she was qualified to lead the department.

After accepting the job, Mr. Straight did not relocate to Pennsylvania, where most of the employees reporting to him worked, but instead only worked eight days per month in Pennsylvania, spending the balance of his time in his home state of Massachusetts.  Under Mr.

Straight's leadership of the department, Ms. Frintner was once again assigned extensive leadership and managerial responsibilities.  Other departmental employees, including Technical Writer Michael Sheldon, also took on additional responsibilities.  However, no manager-level position was created in the department, despite the fact that directors at TruePosition normally had at least one manager directly reporting to them.

Shortly after Mr. Straight started working for TruePosition, the documentation department began a project to convert documentation into a content management system (CMS).  As this project started, Mr. Straight brought in another former OpenWave employee, Jason Owen, to help lead the project.  Mr. Owen, a technical writer at OpenWave who had worked for Mr. Straight on OpenWave's CMS implementation, had originally interviewed for the position of Senior Technical Writer at TruePosition–the same job title held by Ms. Frintner at the time.  However, the position he actually accepted was the position of Information Architect.  That title had never previously existed at TruePosition, it was not posted internally, and Mr. Owen was paid a higher salary for that job than he would have earned as a Senior Technical Writer.

Again, there is some dispute as to whether Ms. Frintner was qualified for the position of Information Architect.  TruePosition contends that the job required technical knowledge and training which Ms. Frintner did not possess (while Mr. Owen did), and Ms. Frintner counters that she met all of the "Major Responsibilities" and "Required Knowledge, Skills and Experience" described in the Information Architect job description by virtue of her work experience.  She also points out that about two weeks before Mr. Owen assumed the job, she had read a book about CMS and, based on the description of information architects in that book, told Mr. Straight that she was interested in such a position.

4

In any case, both Ms. Frintner and Mr. Owen were intimately involved in the CMS project as "co-leads" with equal responsibility for the project. Ms. Frintner handled the "business" side of the project, and Mr. Owen handled the "technical" side of the project. While Mr. Owen spent about 70% of his time on this one project, Ms. Frintner testified that she only spent about 30%-40% of her time on CMS. Ms. Frintner testified to having a good working relationship with Mr. Owen, despite a "slight" disagreement on which vendor should be selected for the CMS project.[4] Mr. Larrabee, on the other hand, testified that the two did not get along and that Ms. Frintner was causing disruption in the group.

Throughout this time, Mr. Straight and his management abilities were criticized by all of the employees in the documentation department because of lack of accessibility, indecisiveness, lack of organization, lack of communication skills, and other alleged deficiencies; and some employees even took their concerns to the Human Resources department. Ms. Frintner was one of these employees, and she did so on her own, in person and by email, and accompanied by others in the department. Technical Writers Mary Laura Walsh, Hillary Donaghy, and Mike Sheldon also complained to Human Resources about Mr. Straight. According to Mr. Sheldon, Mr. Picciocchi, Director of Human Resources, at one time told him that Mr. Straight had been placed on a performance improvement plan because of his deficiencies.

In early 2009, Mr. Straight budgeted a promotion for Ms. Frintner to Principal Technical Writer, and for Derek Fess, a Technical Writer, to Senior Technical Writer. Although the

---

[4]       The vendor Ms. Frintner supported was initially chosen, but the selected company was unexpectedly acquired by another company and was thus unable to perform the supporting role required by TruePosition.

classification of "principal" had long existed at TruePosition,[5] the position of Principal Technical Writer had never before existed.[6]  Mr. Straight told Ms. Frintner on multiple occasions in 2008 that she deserved and needed a promotion and that he supported a promotion for her.  At her 2008 performance review, which took place in February 2009, Ms. Frintner learned that she would not be receiving this promotion, despite a performance review for 2008 in which she was rated as "exceed[ing] job requirements" in nearly every category and received the highest rating of anyone in the department, as well as the highest bonus of any member of her group.  Mr. Straight informed Ms. Frintner that Mr. Larrabee had decided not to promote anyone in Research and Development that year.[7]  In response, she told Mr. Straight, "I'm delighted to hear I still don't have a penis."

According to TruePosition, in mid-2009, its parent company ordered a 10% budget reduction, including reductions in force.  However, the record citations provided by TruePosition for this motion support only that over the years, budget-related reductions in force sometimes occurred, not that there was a specific budget directive in 2009.  There is also a dispute as to whether a budget-related reduction in force was necessary in the Research and Development Department at TruePosition.  Ms. Frintner points to a 2009 email from Mr. Larrabee discussing

---

[5]    Approximately 48 employees were classified as "principals" at one time or another at TruePosition; all 48 were men, and all were employed in departments other than documentation.

[6]    As it turns out, the position of Principal Technical Writer never came to exist, even though Mr. Straight did draft a job description for the position and submitted it to Human Resources

[7]    Despite this statement by Mr. Straight, at least five male Research and Development employees were promoted in 2009, including at least one in the documentation department.

"excess money available," and to a budget document showing that in 2009, the documentation and training groups spent about $140,000 less than was budgeted for those groups for the year, with the bulk of that underspending specifically in the documentation group.

This "reduction in force" was the specific reason given for Ms. Frintner's eventual termination from TruePosition in 2009.  However, other explanations were offered by different employees involved in her termination.  Despite the glowing performance review just months earlier, in which Mr. Straight wrote that Ms. Frintner had "done more than anyone to insure the success of the Tech Pubs group over the past year" and that he "need[ed Ms. Frintner] to continue in [her leadership] role" in the department, Mr. Straight testified at his deposition that by mid-2009 she was creating friction in the group.[8]  Mr. Larrabee suggested that Ms. Frintner be let go as part of a reduction in force, which Mr. Straight testified he viewed as a way to get rid of a problem employee.  Mr. Larrabee also described Ms. Frintner as having excess skills for her role.

As the discussions about Ms. Frintner's coming separation from the company progressed, Mr. Straight sought to have her transferred to another part of the company, an idea to which Mr. Larrabee objected.   On August 3, 2009, Mr. Picciocchi and Mr. Straight met with Ms. Frintner and informed her that she was one of many employees being laid off that day due to budget reductions.  She was offered a severance agreement and was told that she was eligible for re-hire. However, no one else at TruePosition was laid off that day.  In fact, two other male employees in

---

[8]        TruePosition also contends that Ms. Frintner argued with male and female co-workers and stopped speaking to Derek Fess, a Technical Writer, but the record citations provided do not show that Ms. Frintner argued with multiple co-workers and, as to Derek Fess, seem to indicate that he stopped talking to her, as well as to other department members.

the Research and Development Department[9] who had been slated for a layoff on the same day

retained their jobs for at least several more months.  The same month that Ms. Frintner was

terminated, Derek Fess was promoted from Technical Writer to Senior Technical Writer, which

was the title Ms. Frintner held before she was terminated.[10]

On October 1, 2009, Ms. Frintner filed an EEOC charge, complaining that because of her

gender, she was denied equal pay and promotions and was terminated by TruePosition.  The

charge was dual-filed with the PHRC.  After receiving right-to-sue letters, Ms. Frintner filed this

lawsuit on May 27, 2011, claiming that TruePosition violated Title VII, the PHRA, and the Equal

Pay Act.  After discovery, TruePosition filed the pending motion for summary judgment, as well

as three motions *in limine* to exclude certain evidence at trial.  For the reasons set forth below,

the Court will grant in part and deny in part TruePosition's motion for summary judgment, and

will grant TruePosition's motions *in limine*.

## II.   LEGAL STANDARDS

### A.      Motion for Summary Judgment

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other

materials," the moving party persuades the district court that "there is no genuine dispute as to

---

[9]     As noted elsewhere, Mr. Larrabee headed the Research and Development Department, and the Technical Publication (or Documentation) Department was part of the larger Research and Development Department.

[10]     Mr. Straight budgeted for that promotion at the same time he had budgeted for a promotion for Ms. Frintner.  While Mr. Fess was informed of the promotion in August 2009, the promotion was made retroactive to July 1, 2009.

any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record."  Fed R. Civ. P. 56(c)(1).  "The Court need consider only the cited materials" when determining whether there exists a genuine issue of material fact for trial.  Fed R. Civ. P. 56(c)(3).  If the cited evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

> **B.**    **Motion *in Limine***

The Court exercises its discretion to rule *in limine* on evidentiary issues "in appropriate cases."  *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), rev'd on other grounds sub nom., *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

9

Accordingly, the Court may decide such motions to ensure the jury is not exposed to unfairly prejudicial, confusing, or irrelevant evidence, even if doing so may limit a party's defenses.  *See United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988).  An *in limine* motion "is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted).  It may also be appropriate for the Court to consider an *in limine* motion when it is more efficient to rule prior to trial and the pre-trial motion facilitates more thorough briefing than would likely be available during the course of trial.  *Japanese Elec.*, 723 F.2d at 260.  Even so, if the context of trial would provide clarity, the Court may defer the issues until trial.  *Id.*

The Court also considers these pending *in limine* motions, when appropriate, under Federal Rules of Evidence 401, 402, and 403.  Federal Rule of Evidence 402 provides that evidence is not admissible if it is not relevant, and evidence is not relevant when it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401. Even if evidence is relevant, however, it may nevertheless be subject to exclusion under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Unfair prejudice is an "undue tendency to suggest decision on an improper basis."  *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 188 (3d Cir. 1990) (citing Fed. R. Evid. 403 advisory committee's note).

III.   DISCUSSION

A.     TruePosition's Motion for Summary Judgment

To establish a prima facie case of discrimination under either Title VII or the PHRA,[11] a plaintiff must show that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subject to an adverse employment action, and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action. *Serullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff can set forth a *prima facie* case, the defendant then must proffer a legitimate, non-discriminatory reason for the adverse action. Faced with a legitimate, non-discriminatory reason, a plaintiff then bears the burden of showing that the stated defense reason is a mere pretext for discrimination, because she has introduced evidence that would lead a jury to either disbelieve the defendant's reason or believe that discrimination was more likely than not a motivating or determining cause of the adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

The test for Equal Pay Act claims differs from the familiar *McDonnell Douglas* framework applied in Title VII and PHRA cases. Under the EPA, first a plaintiff must demonstrate that employees of the opposite sex were paid differently for performing "work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). The burden of persuasion, rather than merely of production, then shifts to the employer, who may avoid liability by establishing one of the four affirmative defenses enumerated under the EPA: "(i) a bona fide seniority system, (ii) a merit

---

[11]     "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006).

system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex."  29 U.S.C. § 206(d)(1); *see also Stanziale*, 200 F.3d at 107, 107n.6.  Unlike under Title VII, "[i]t is not enough that the employer's proffered reasons could explain the wage disparity; the proffered reasons must in fact explain the wage disparity."  *Rowland v. Certainteed Corp.*, Civ. A. No. 08-3671, 2009 WL 1444413, at *8 (E.D. Pa. May 21, 2009) (citing *Stanziale*, 200 F.3d at 108).

TruePosition argues that it is entitled to summary judgment as to all of Ms. Frintner's claims.

### 1.    Failure to Promote

TruePosition begins by arguing that Ms. Frintner's claim that it wrongfully failed to promote her in 2007 is time-barred.  It is undisputed that Ms. Frintner did not file an EEOC charge until October 1, 2009, well over 300 days after the September 2007 decision not to promote her to Senior Documentation Lead.[12]  Ms. Frintner does not deny that, generally speaking, denials of promotions are discrete acts for purposes of the EEOC filing requirements. *See* Pl.'s Opp. at 14 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  She argues, however, that the "continuing violation" doctrine applies to preserve her failure to promote claim because it is "tethered factually" to her equal pay claim.  She contends that each time she was denied pay commensurate with the duties she performed, she was also denied a promotion.

_____

[12]    Although these actions are not explicitly mentioned in her Complaint, to the extent that Ms. Frintner bases her failure to promote claim on TruePosition's failure to promote her to replace Mr. Maiorano or to the position of Information Architect in early 2008, the same analysis would apply to them, given that both of those actions (or, rather, failures to act) took place more than 300 days before Ms. Frintner filed her EEOC charge.

As an initial matter, Ms. Frintner appears to conflate the "continuing violation" doctrine with the Fair Pay Act, which are conceptually distinct.  The "continuing violation" doctrine serves to allow plaintiffs to pursue discrimination claims that are part of an ongoing discriminatory practice as long as one discriminatory act occurred within the 300-day period.  *See Rush v. Scott Specialty Gases*, 113 F.3d 476, 480-81 (3d Cir. 1997).  Discrete acts, such as a failure to promote or the receipt of a discriminatory paycheck, do not fit within this exception.  *See, e.g., Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"); *Mikula v. Allegheny County of PA*, 583 F.3d 181, 185-86, 186n.3 (3d Cir. 2009) ("the [continuing violation] doctrine does not apply to discrete, completed employment actions," including the receipt of a discriminatory paycheck).  Thus, to the extent her failure to promote claim is based on discrete acts occurring more than 300 days before October 1, 2009, whether those acts are "tethered" to her equal pay claim or not, the continuing violation doctrine will not save the claim.

The Fair Pay Act is distinct from the "continuing violation" doctrine.  In reaction to *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), Congress passed the Lilly Ledbetter Fair Pay Act of 2009, which allows plaintiffs to sue when a discriminatory compensation decision was made more than 300 days before the filing of an EEOC charge as long as they received a paycheck issued pursuant to that discriminatory compensation decision within the 300-day period.  *See* 42 U.S.C. § 2000e-5(e).  Compensation claims to which the Fair Pay Act apply involve multiple discrete acts of discrimination, which, again, cannot be part of a

13

continuing violation.  *See Homel v. Centennial Sch. Dist.*, 836 F. Supp. 2d 304, 322n.28 (E.D. Pa. 2011).

In support of her contention that TruePosition's failure to promote her in 2007 is not time barred, Ms. Frintner cites, without commentary, *Homel v. Centennial Sch. Dist.*, 836 F. Supp. 2d 304 (E.D. Pa. 2011).  Rather than bolster her argument, however, *Homel* actively undermines it. In that case, a female employee of a school district claimed that the district discriminated against her on the basis of gender, the exercise of her right to free speech, and age when, among other things, it "promoted" her to a lower-paying and less prestigious position than the one for which she applied, failed to promote her to a higher position, paid her one salary for performing multiple jobs, and terminated her.  *See id.* at 319.  While the court applied the Fair Pay Act to save her otherwise time-barred claim that she performed multiple jobs while only being paid for one, it also held that her failure to promote claims based on conduct outside of the 300-day window were time-barred.  *Id.* at 320-21.  The court acknowledged that the Fair Pay Act, as distinguished from the continuing violation doctrine, may save an employment discrimination claim when "there is a nexus between the adverse employment action and the resultant lower salary."  *Id.* at 321.  However, the court specifically noted that the Fair Pay Act "does not apply to all adverse employment actions that may affect compensation, such as a *failure to promote*." *Id.* (emphasis added).  *See also Noel v. The Boeing Corp.*, 622 F.3d 266, 272-73 (3d Cir. 2010) ("On the basis of a plain and natural reading, we conclude that the [Fair Pay Act] does not apply to failure-to-promote claims.").  Thus, although the Fair Pay Act would save Ms. Frintner's unfair compensation claim from being wholly time-barred, her failure-to-promote claim is time-barred to the extent that it is based on a failure to promote that occurred more than 300 days

before October 1, 2009.

TruePosition also argues that its failure to promote Ms. Frintner to the position of Principal Technical Writer in 2009 is not actionable because that position did not exist, either before or after TruePosition decided not to promote Ms. Frintner.  Therefore, TruePosition contends, Ms. Frintner cannot make out a *prima facie* case because failing to create a new position is not an adverse action for purposes of Title VII or the PHRA.  Ms. Frintner counters that because the general classification of "Principal" long existed at TruePosition and because she was promised the promotion, she is still entitled to bring her failure to promote claim with respect to the 2009 denial of a promotion.

The Third Circuit Court of Appeals addressed the issue of failure-to-promote claims based on failure to create a new position in *Young v. Temple Univ. Hosp.*, 359 Fed. Appx. 304 (3d Cir. 2009).  In that case, the plaintiff spoke with her supervisor about a promotion from Certified Occupational Therapist Assistant to Senior Certified Occupational Therapist Assistant, a position which did not exist at the defendant-hospital but which the plaintiff had held at other places of employment.  *Id.* at 306.  Her supervisor agreed that she was qualified for such a position and said that she would look into creating the position.  *Id.*  Ultimately, the position was never created for the plaintiff or for anyone else, and the plaintiff sued the defendant for, among other things, this failure to create the position and promote her to it.    Because the position did not exist and was not promised to her, the Third Circuit Court of Appeals upheld the district court's ruling that there was no adverse employment action of which to complain.  *Id.* at 310.

Similarly, in *Stoppi v. Wal-Mart Trans., LLC*, No. 3:09cv916, 2010 WL 3398990 (M.D. Pa. Aug. 26, 2010), the plaintiff was denied an opportunity to interview for a job that would have

been a promotion for her.  In the end, however, although other applicants did interview for the job, the position was never filled.  The court held that because the defendant did not promote anyone, the plaintiff had failed to establish an actionable adverse employment action.  *Id.* at *9.

It is undisputed that the position of Principal Technical Writer was never created at TruePosition, and despite Ms. Frintner's argument to the contrary, the evidence in this case does not support an actual promise to promote Ms. Frintner to such a position.  Ms. Frintner cites to her deposition to show that she was promised a promotion, but the deposition testimony to which she refers, even taken in the light most indulgent and favorable to Ms. Frintner, demonstrates not more than that Mr. Straight wholeheartedly believed that Ms. Frintner deserved and needed a promotion and promised to *try* to get her one, that he proposed a promotion for her, and that someone even drafted a job description for a position that would be a promotion for her.  This case, then, is not meaningfully distinguishable from the scenario addressed by the Third Circuit Court of Appeals in *Young*, in which the plaintiff's supervisor told the plaintiff that she was qualified for a promotion and promised to "look into" creating a position to which to promote her.  Thus, Ms. Frintner's failure-to-promote claim cannot survive summary judgment.

### 2.   *Disparate Compensation*

Turning to Ms. Frintner's disparate compensation claim, the Court will first address the claim under Title VII and the PHRA, and then under the EPA.  As to her Title VII and PHRA claims, TruePosition argues that Ms. Frintner has failed to establish a *prima facie* case because the employees she identified as "similarly situated" are not, as a matter of law, "similarly situated."  To raise an inference of discrimination for purposes of establishing a *prima facie* case of discrimination, a plaintiff may proffer evidence of another employee who is not in the

16

plaintiff's class, received more favorable treatment than the plaintiff, and is similarly situated to the plaintiff. *See Fuentes*, 32 F.3d at 765. "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects." *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220, 222-223 (3d Cir. 2009) (internal quotation omitted).

"Different positions with different qualifications, even if they are superficially comparable, are not 'similarly situated' for purposes of establishing a prima facie wage discrimination claim." *Nagle v. RMA, The Risk Management Ass'n*, 513 F. Supp. 2d 383, 389 (E.D. Pa. 2007) (internal quotation omitted). In *Nagle*, a female plaintiff claimed that two male employees who were given larger bonuses were similarly situated, such that the pay disparity could give rise to an inference of discrimination. Despite the fact that the two men had managerial duties within their departments as did the plaintiff, the court granted summary judgment to the defendant because the two comparators were in different departments and performed different job duties that required different skills. *Id.* at 389.

Ms. Frintner has identified five male employees who she claims were similarly situated to her with respect to her wage discrimination claim.[13] However, those comparators fail to raise an inference of discrimination, much like the comparators proffered by the plaintiff in *Nagle*. The first is Jason Owen. Ms. Frintner asserts that she and Mr. Owen were "co-project leads" on the content management system and had "equal responsibilities for that project." Pl.'s Counterstatement of Facts, ¶ 34 (citing the deposition testimony of Mr. Straight). She admits,

---

[13] Ms. Frintner also contends in her Counterstatement of Facts that her comparators also include all employees classified as "Principals" by TruePosition. However, she proffers no evidence that the tasks that she performed bore any relation to the tasks performed by any specific "Principal" employees at TruePosition or that all Principals, regardless of department, do substantially the same job.

however, that their tasks on the project were different, noting that Mr. Owen was responsible for the "technical side," while she took care of the "business side" of the project. While Mr. Owen had prior experience with the DITA XML documentation standard used in the content management system project and had earned degrees in technical writing, Ms. Frintner does not present an equivalent profile. Thus, Ms. Frintner's assertion that she and Mr. Owen were doing essentially the same thing is not backed by the evidence – although they both had responsibility for the same project's ultimate outcome, the tasks they each performed pursuant to that responsibility differed substantially. Ms. Frintner's citation to the job description for an Information Architect and her assertion that she was already performing the tasks described therein similarly makes no difference here, where the real tasks the two were performing are distinguishable.

Ms. Frinter also offers as comparators James Amos and Tony Monico. Messrs. Amos and Monico are both engineers and managers who worked in product testing at TruePosition. Taking a broad view, their jobs bear some similarity to Ms. Frintner's, in that they managed projects, allocated resources, represented their departments in interdepartmental meetings, and interviewed candidates for employment within their departments. However, such a broad view ignores the very real day-to-day differences in job requirements and duties. Both men, for example, have engineering training and use it in performing their jobs, manage the testing of products, interact directly with customers, and perform tasks such as coding that involve technical knowledge beyond that used or required of technical writers.

Similarly, Mitchell Perilstein, Manager of Sustaining Engineering, performs general managerial duties, but also has a degree in engineering and has involvement in software

development, debugging systems, interacting with customers, and using various coding languages. James Chan, a Principal of Engineering Systems, in addition to collaborating with other departments, supervising and training others, and overseeing the work product of others, has advanced engineering degrees, uses that engineering knowledge in his work, and has responsibility for designing and evaluating products. Because of the significant differences between the actual duties and skills of these male comparators and those of Ms. Frintner, TruePosition has made out its strong position that it is entitled to summary judgment on Ms. Frintner's disparate compensation claim under Title VII and the PHRA.

The analysis for the EPA is similar. To set forth a claim under the EPA, a plaintiff must show that employees of the opposite sex were paid differently for performing "work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale*, 200 F.3d at 107. That means that the plaintiff and her comparator(s) must have been performing a "common core" of tasks, or, put another way, that a significant portion of the two jobs was identical. *See Brobst v. Columbus Servs. Internat'l*, 761 F.2d 148, 156 (3d Cir. 1985). Ms. Frintner has failed to carry her burden of showing that she and any of her comparators performed a "common core" of tasks. While she cites some overlapping tasks and responsibilities, she fails to present any evidence that these overlapping tasks made up a significant portion of the two jobs. Moreover, her superficial comparisons fail to establish whether even the overlapping tasks are truly similar – she has presented no evidence, for instance, that supervising engineers performing product testing bears any relation to supervising technical writers. Thus, the Court need not reach the question of whether TruePosition has adequately established an affirmative defense, and will grant TruePosition's motion for summary judgment as to Ms. Frintner's EPA

claim.

### 3.   *Discriminatory Termination*

As to Ms. Frintner's termination claim, TruePosition argues that she has not carried her burden to show that her termination was accompanied by any circumstances giving rise to an inference of termination.  On the contrary, Ms. Frintner has presented evidence that two male employees slated to be laid off on the same day she was were retained for at least several months. It is also undisputed that very shortly after she was laid off from the position of Senior Technical Writer, a male employee was promoted to that position.  Ms. Frintner has also shown that no male employees who complained about Mr. Straight's job performance were terminated.

Ms. Frintner has also presented sufficient evidence to overcome TruePosition's proffered a legitimate, nondiscriminatory reason for terminating her.  To prove that TruePosition's proffered reason is pretext, Ms. Frintner must present evidence from which a factfinder could reasonably (1) "disbelieve the employer's articulated legitimate reasons," or (2) "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.  TruePostion contends that Ms. Frintner was terminated due to budget cuts and that she was selected for such a termination because she was a disruptive employee.  Ms. Frintner has produced evidence that these proffered reasons are subject to doubt.  Whether or not Ms. Frintner actually was disruptive, or even considered to be disruptive, is up for debate.  After all, Mr. Straight gave her a glowing performance evaluation and the highest rating and bonus in the department, and recommended her for a promotion.  Mr. Larrabee also discussed the reason for her termination as her excess skill.  Other employees in the department have testified that Ms. Frintner was not disruptive.

20

As to the reduction in force, while Ms. Frintner testified that she was told that there were cuts being made all over the company that day, the truth was that she was the only employee to be laid off that day.  Moreover, very shortly after her termination, another employee was promoted to the same title Ms. Frintner had.  Ms. Frintner has also presented some evidence of a budget surplus in the documentation department that also undercuts the reduction-in-force argument.

Combined with the evidence supporting her *prima facie* case, the evidence undermining TruePosition's proffered nondiscriminatory reason for terminating Ms. Frintner creates a genuine issue of material fact as to whether that proffered reason is merely pretext.  Thus, the Court will deny TruePosition's motion as to Ms. Frintner's termination claim under Title VII and the PHRA.

**B.**    **TruePosition's Motions *in Limine***

*1.*    *Motion* in Limine *regarding time-barred failures to promote*

TruePosition argues that because certain of Ms. Frintner's failure to promote claims are time-barred, the Court should bar her from introducing any testimony or evidence regarding those claims.  Ms. Frintner counters that evidence of an employer's treatment of a plaintiff during the course of that plaintiff's employment may be relevant to the plaintiff's ripe claims, even if that conduct occurred outside of the statute of limitations.  *See, e.g., Morgan*, 536 U.S. at 113 ("Nor does [Title VII] bar an employee from using prior acts as background evidence in support of a timely claim.").  However, the time-barred failures to promote are not proximate in time to Ms. Frintner's one surviving claim relating to her termination, and thus may not be probative with respect to that claim.  To that end, the Court will grant TruePosition's motion, but will

allow Ms. Frintner to argue for the admissibility of specific evidence relating to these time-barred

claims.  Providing Ms. Frintner can articulate reasons that the information can be portrayed as

evidence of or helpful in understanding the conduct relating to her surviving termination claim,

the evidence may be admitted at trial.

2.    *Motion* in Limine *regarding Hillary Donaghy*

TruePosition seeks to exclude former TruePosition employee Hillary Donaghy's

testimony regarding (1) her opinion of Mr. Straight with respect to his feelings toward women, to

the extent that opinion is based on his marital history and family relationships, and (2) the

circumstances under which Ms. Donaghy left TruePosition.  Ms. Donaghy was a Technical

Writer at TruePosition who worked in the department at the same time as Ms. Frintner.  She

testified at her deposition that, in her opinion, Mr. Straight, her supervisor, did not get along with

women, an opinion she based in part on her knowledge of Mr. Straight's unsuccessful prior

marriages and strained relationship with his adoptive mother.  She also testified regarding the

circumstances of her separation from employment at TruePosition.  Ms. Donaghy stated that she

disagreed with Mr. Straight's management style, complained about him to the Human Resources

department, and completed a survey in which she expressed that Mr. Straight should be

terminated.  Thereafter, TruePosition terminated Ms. Donaghy in February 2009.  The precise

facts surrounding her termination are vigorously disputed and involve conflicting testimony and

documentary evidence regarding her competence, disruptiveness, disagreements with Mr.

Straight, and whether or not she actually requested to be terminated.[14]

---

[14]    Ms. Donaghy testified at her deposition that at the time she was terminated, she
did not believe her gender had anything to do with her termination.  She also released all claims
against TruePosition by signing an agreement accepting a severance package.

Ms. Frintner argues that Ms. Donaghy's testimony concerning Mr. Straight's "issues" with women is directly relevant to her claims and permitted by Federal Rule of Evidence 701.[15] She also contends that because the circumstances surrounding Ms. Donaghy's termination echo those surrounding her own, evidence relating to her termination is relevant.  She points to the fact that each of them complained about Mr. Straight, that Mr. Straight's efforts to transfer both of them to another department were thwarted by Mr. Larrabee, and that neither of them were subject to any disciplinary warnings or put on a performance improvement plan prior to their terminations.

The danger of a trial within a trial with respect to Ms. Donaghy's termination weighs in favor of granting TruePosition's motion, as does the very limited probative value of gossip about Mr. Straight's personal life.  As with TruePosition's motion *in limine* regarding time-barred claims, although the Court will grant this motion, Ms. Frintner may request permission to introduce some or all of this evidence, depending on developments at trial and providing she can articulate a viable reason for doing so.

   3.   *Motion* in Limine *regarding various evidence relating to TruePosition management*

TruePosition's third motion *in limine* seeks to exclude three categories of evidence: (1) evidence relating to the gender composition of TruePosition's management team; (2) evidence relating to the ownership and subsequent sale of Mr. Larrabee's sports bar pursuant to an agreement with TruePosition; and (3) evidence related to an SEC investigation of TruePosition

---

[15]    Federal Rule of Evidence 701 permits lay witness testimony to the extent that it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

CFO Craig Waggy that occurred while he was with his former employer.[16]

TruePosition has virtually no women in upper management positions.  TruePosition argues that the gender composition of the management team is irrelevant to her claim, citing various cases from other circuits holding that statistical evidence of the composition of a company's workforce is not relevant without comparative evidence relating to the labor market. It further argues that even if it is relevant, its probative value is outweighed by the potential for unfair prejudice because Ms. Frintner has not presented evidence of a pattern or practice of discrimination at TruePosition.  Ms. Frintner counters that statistical evidence is admissible even in individual disparate treatment cases, citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1216-17 (3d Cir. 1995).  In that case, the Third Circuit Court of Appeals held that "[e]mployment discrimination plaintiffs are not precluded from introducing statistical evidence as circumstantial evidence of discrimination in a disparate treatment case," but noted that the statistical evidence in that case, which was presented in the form of incomplete, handwritten organizational charts, served more as "testimonial aids to describe the employees' positions relative to key decisionmakers." *Id.*

As to Mr. Larrabee, before he worked at TruePosition, he owned and operated a sports bar in New Hampshire.  After joining TruePosition, Mr. Larrabee entered into an agreement with the company whereby he agreed to sell the sports bar in return for continued employment and a payment of $100,000 if he sold the bar within a certain time frame.  There is a dispute as to whether he sold the bar in the appropriate time frame, although there is no dispute as to whether

---

[16]     Both Mr. Larrabee and Mr. Waggy were involved in the decision to terminate Ms. Frintner.

he received the lump sum payment from TruePosition.  TruePosition argues that its private arrangement with Mr. Larrabee has no bearing on the case whatsoever.  Ms. Frintner counters that the evidence relating to Mr. Larrabee's bar shows that Mr. Larrabee breached one of TruePosition's employee policies and was rewarded rather than punished.  She argues that this demonstrates disparate treatment in that Mr. Larrabee, a man, was rewarded for his violations of TruePosition's policies, while she, a woman, was treated poorly despite following the rules and taking on additional responsibility.

Mr. Waggy was investigated by the SEC in 2006 with respect to the reporting of revenue at his former employer.  He was ultimately fined by the SEC.  TruePosition argues that introduction of this evidence is not permitted by Federal Rule of Evidence 404, which prohibits the introduction of character evidence to prove that "on a particular occasion the person acted in accordance with the character trait" and the introduction of prior wrongdoing "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Ms. Frintner again points to this as evidence of a male employee who did not live up to the guidelines set forth in the Employee Handbook, in that he told TruePosition about the investigation but not about the fine or findings against him, and TruePosition failed to punish him or to even investigate further.  She again claims that this is evidence that TruePosition inconsistently disciplined women more harshly than men.  She also argues that this evidence is probative of Mr. Waggy's truthfulness and may be used to impeach him at trial.

Once again, Ms. Frintner's arguments are unconvincing, and the evidence sought to be introduced regarding management composition and the treatment of two male employees who are in no way similarly situated to Ms. Frintner does not appear to have probative value with regard

25

to Ms. Frintner's termination claim.  The Court will grant TruePosition's motion, but will give Ms. Frintner an opportunity, in the context of trial, to articulate reasons for why any of these three categories of evidence should be admitted.

**IV.   CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part TruePosition's Motion for Summary Judgment and will grant TruePosition's Motions *in Limine* without prejudice.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE